**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Everett TOWERS, Defendant-Appellant.**

No. 84–2523.

United States Court of Appeals, Seventh Circuit.

Argued April 10, 1985.

Decided Oct. 15, 1985.

Robert G. Perry, Asst. U.S. Atty., John Daniel Tinder, U.S. Atty., Indianapolis, Ind., for defendant-appellant.

Kevin McShane, McShane & Inman, Indianapolis, Ind., for plaintiff-appellee.

Before WOOD and COFFEY, Circuit Judges, and PECK, Senior Circuit Judge.*

COFFEY, Circuit Judge.

The defendant, Everett Towers, appeals his convictions for possession and conspiracy to possess cocaine with intent to distribute and distribution of cocaine. Towers also appeals his sentence as a Dangerous Special Drug Offender. We affirm.

## I

A grand jury in the Southern District of Indiana returned an indictment on July 14, 1982 against ten individuals for conspiring to distribute cocaine from or about September, 1976 and continuing to January of 1981 within the Southern District of Indiana and elsewhere. In addition to charging the defendant Towers with conspiracy to distribute cocaine, the indictment also charged Towers with two counts of possession of cocaine with intent to distribute in January of 1981 and two counts of possession of cocaine with intent to distribute and distribution of cocaine in December of 1977.

The evidence at trial revealed that Towers was the source of cocaine for a group of narcotics dealers who sold the cocaine in Indiana, Florida, and, on one occasion, California. In October of 1976, three men in Anderson, Indiana (Woods, Cockman and Doyle), who had purchased marijuana and small amounts of cocaine from Towers since 1974, agreed to pool their money to purchase for resale large amounts of cocaine from Towers, who resided in Florida. Doyle traveled to Florida, purchased cocaine from Towers with the collective funds, approximately $100,000. Woods, Cockman and Doyle resold the cocaine in Indiana and California. In furtherance of the conspiracy, Woods, Cockman and Doyle moved to Florida in late 1976 or early 1977, and continued to purchase cocaine from Towers, reselling the cocaine to purchasers and distributors in Florida who transported the drugs to Indiana for resale. Shortly after their arrival in Florida, one Fred McCord joined the conspiracy after Cockman and Doyle permanently ceased doing business with Woods because he talked too much about his involvement in selling narcotics with other people. McCord's role in the conspiracy was to sell the cocaine Cockman and Doyle purchased from Towers.[1] In early December of 1977, Cockman was arrested in Fort Lauderdale, Florida by agents of the Drug Enforcement Administration ("DEA") for attempting to sell cocaine obtained from Towers. Following Cockman's arrest, Towers continued to sell cocaine to Doyle for resale, while McCord fled to South America and began smuggling cocaine into the United States with other parties. McCord returned to the United States in 1978, moved into Towers' home, and resumed selling Towers' cocaine. In January of 1980, McCord was arrested by a DEA agent for distributing narcotics.

Subsequently, on January 23, 1981, one James Barron, who transported drugs from Florida to Indiana and California for Doyle and McCord from 1976 through 1980, was arrested in Indianapolis, Indiana after selling cocaine to an agent of the DEA for $16,800. Barron's supplier of the cocaine, Jeffrey Doyle, was arrested shortly thereafter by DEA agents for his involvement in this narcotics transaction. The agents obtained a warrant, searched Doyle's apartment, and seized, along with other evidence, a key to a safety deposit box. The agents obtained another search warrant for the safety deposit box and upon search discovered fifty grams of cocaine.

Towers, who was arrested in 1984, some three years later, was convicted in a jury

---

* The Honorable John W. Peck, Senior Circuit Judge of the United States Court of Appeals for the Sixth Circuit, is sitting by designation.

1. McCord testified that the cocaine had a street value of $44,000 to $46,000 per kilogram.

trial in the United States District Court for the Southern District of Indiana of one count of conspiracy to possess cocaine with intent to distribute, two counts of possession of cocaine with intent to distribute and distribution of cocaine, and two counts of possession of cocaine. After a post-trial hearing, the district court determined that Towers was a Special Dangerous Drug Offender pursuant to 21 U.S.C. § 849(e)(2) and (e)(3). Towers was sentenced to twenty years imprisonment for his conviction on the conspiracy to possess cocaine with intent to distribute count and to eighteen years imprisonment for each of the four remaining counts. Three of the eighteen year sentences run concurrently with the twenty year sentence but the fourth eighteen year sentence is consecutive to the twenty year sentence. Additionally, Judge Steckler ordered Towers to serve a special parole term of three years on each of the possession and possession with intent to distribute counts and fined Towers $125,-000. On appeal, Towers argues: (1) the court erred in allowing evidence of Towers' real estate transactions during the period of the conspiracy offered to prove that Towers accumulated a large amount of money from his narcotics trafficking and attempted to conceal that wealth; (2) the evidence was insufficient to connect Towers with either Barron's sale of cocaine in Indianapolis in January of 1981 or with the cocaine discovered in Doyle's safety deposit box; (3) the court erred in failing to give the defendant's tendered instruction dealing with proof of multiple conspiracies; (4) the court erred in determining Towers to be a dangerous special drug offender.

## II

### A. The Real Estate Transactions

The government presented testimony concerning Towers' real estate transactions during the period of the conspiracy to demonstrate that Towers accumulated large amounts of money from his narcotics dealings and attempted to conceal these assets by utilizing aliases, corporations and "straw men" to purchase property. Specif-ically, William C. Shaw, a Florida attorney, testified that the Capuchin Corporation, an entity Shaw incorporated at Towers' behest, sold land located in Collier County, Florida to Jeffrey Doyle in 1978. Additionally, two corporations controlled by Towers under an alias sold a piece of property in Broward County, Florida for $500,000. Towers paid a James Tetro $50,000 to sign documents as an officer of the corporation and to appear for the corporation at the closing. The net proceeds of the sale, approximately $260,000, were paid in cash.

Towers contends that the admission of this evidence under Fed.R.Evid. 404(b) was improper because the real estate transactions "were not similar to the charges in question." Additionally, Towers asserts that the prejudice resulting from the admission of the evidence outweighed the transactions' probative value because, "there was never a link between any financial transaction of Appellant Towers' and any dealing of cocaine."

Evidence is admissible under Fed. R.Evid. 401 and 402 if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Additionally, Fed.R.Evid. 404(b) permits the admission of evidence of other acts, similar to the conduct charged in the indictment, to prove, "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Towers was charged with, *inter alia,* conspiracy to possess cocaine with intent to distribute. Concealing the source of proceeds from narcotics transactions ("laundering") is one facet of a conspiracy to distribute narcotics. *United States v. Metz,* 608 F.2d 147, 153 (5th Cir.1979). Moreover,

"[w]here a defendant is on trial for a crime in which pecuniary gain is the usual motive for or natural result of its perpetration and there is other evidence of his guilt, evidence of the sudden acquisition or expenditure of large sums of money by the defendant, at or after the time of the commission of the alleged

offense, is admissible to demonstrate the defendant's illegal obtention of those funds. Evidence of this type is admissible even though the government does not specifically trace the source of those funds to the illegal acts charged against the defendant because 'a dishonest acquisition ... [is] a natural and prominent hypothesis' ... explaining the defendant's affluence."

*United States v. Chagra,* 669 F.2d 241, 256 (5th Cir.1982). When evidence that a defendant engaged in a large scale continuing narcotics enterprise is presented, an objection to evidence of the defendant's receipt of large sums of money goes to the weight rather than the admissibility of the evidence. *Id.; see also United States v. Crisp,* 435 F.2d 354, 360 (7th Cir.1970), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116; *United States v. Robinson,* 635 F.2d 981, 987 (2d Cir.1980), *cert. denied,* 451 U.S. 992, 101 S.Ct. 2333, 68 L.Ed.2d 852. An examination of the record reveals that Towers engaged in a large narcotics trafficking enterprise during the time he owned or sold the real estate. Specifically, McCord and Cockman testified that Towers sold cocaine to Doyle and other members of the conspiracy from 1974 to 1981. Doyle and the other members of the conspiracy sold the cocaine obtained from Towers to Florida purchasers and to distributors who transported the narcotics to Indiana for resale. Moreover, McCord further informed the court that, while he was living in Towers' home in 1978, he observed large amounts of money ($35,000 to $45,00) and one to two kilograms of cocaine at the residence. We hold that admission of the evidence concerning the real estate transactions was proper because the evidence demonstrated Towers' scheme to conceal the proceeds of his narcotics trafficking.

B. Sufficiency of the Evidence on Counts IX and XII

Towers challenges his conviction on Count IX of the indictment, based on Barron's January 23, 1981 sale of cocaine to a DEA agent in Indianapolis, because, "no evidence was presented that Mr. Towers actually participated in the sale, or that he was even in the Southern District of Indiana at the time, [thus] any determination of his guilt on that count would have to have been based on evidence that he was the source of the cocaine, thereby making him an aider and abettor under 18 U.S.C. § 2." Although Towers concedes that the evidence demonstrates that Barron obtained the cocaine from Doyle, he contends, "there is *no substantial evidence* showing where Doyle ... obtained the cocaine." (emphasis his). Similarly, Towers argues that his conviction on Count XII, based on the cocaine in the safety deposit box, cannot stand because, "[t]here was no evidence whatsoever presented with respect to the identity of the source [of the cocaine]...."

■ In evaluating the sufficiency of the evidence in a criminal case, the reviewing court must determine, "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *Glasser v. United States,* 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). The inference of the defendant's guilt of a criminal offense may be created either by direct evidence or by circumstantial evidence and circumstantial evidence is of equal probative value to direct evidence. *United States v. Glasser,* 443 F.2d 994 (2d Cir.), *cert. denied* 404 U.S. 854, 92 S.Ct. 96, 30 L.Ed.2d 95 (1971). The evidence presented by the government established a continuing relationship between Towers and Doyle involving substantial narcotics transactions from 1976 to 1981. Cockman and McCord's testimony established that Towers was Doyle's source of cocaine before Cockman's arrest and McCord's testimony about Towers' activities after the arrest demonstrated that Towers continued to supply Doyle with narcotics for distribution. Moreover, during their search of Doyle's Indianapolis apartment, which he shared with his girlfriend, the DEA agents found a gold brace-

let engraved "Everett" and two airline tickets dated December, 1980, for travel from Indianapolis to Florida in the names of Mr. and Mrs. David Woods. The bracelet and the airline tickets are evidence that Towers and Doyle maintained contact and that Doyle and his girlfriend had traveled under false names to Florida, Towers' base of operations, within sixty days of the seizure of the cocaine in the apartment. Finally, a government agent's testimony in regard to Doyle and Towers' telephone records revealed that Doyle, Towers and other members of the conspiracy frequently communicated in late 1980. We hold that a reasonable trier of fact could infer from this direct and circumstantial evidence of the continuing relationship between Towers and Doyle involving substantial narcotics transactions from 1976 through 1980 that Towers was the source of the cocaine Doyle sold Barron and of the cocaine stored in Doyle's safety deposit box.

## C. The Rejected Jury Instruction

The trial judge ruled that the evidence did not warrant giving Towers' proffered instruction directing the jury to acquit the defendant if it found that the government proved multiple conspiracies rather than the single conspiracy charged in the indictment. Towers argues that the district court erred because the conspiracy terminated with the 1977 arrest of Cockman and a separate conspiracy was formed at some unspecified time.

■ A reviewing court determining whether the evidence established a single conspiracy or multiple conspiracies must consider the evidence in the light most favorable to the government. *United States v. Read,* 658 F.2d 1225, 1230 (7th Cir.1981). To determine whether a single or a multiple conspiracy existed, the court must look to the nature of the agreement. *United States v. Kendall,* 665 F.2d 126, 136 (7th Cir.1981). "If the persons join together to further one common design or purpose, a single conspiracy exists." *Id.*

"While the parties to the agreement must know that others are participating in the conspiracy, they neither have to personally know the individuals involved, nor do they have to participate in every facet of the conspiracy scheme. As long as the conspiracy continues and its goal is to achieve a common objective ... parties may still be found guilty even though they join or terminate their relationship with the core conspirators at different times."

*United States v. Noble,* 754 F.2d 1324, 1329 (7th Cir.1985). A conspiracy does not terminate with the arrest of one of the conspirators if the goal of the conspiracy has not been accomplished. *United States v. Testa,* 548 F.2d 847, 852 (9th Cir.1977). A conspiracy to distribute narcotics continues after the arrest of one of the conspirators if the unarrested conspirators continue to conspire to distribute narcotics. *United States v. Felts,* 602 F.2d 146, 149 (7th Cir. 1979). "The trial judge is in the best position to determine whether the possibility of variance exists [because multiple conspiracies were shown.] *Kendall,* 665 F.2d at 137. A trial court does not err in refusing to give multiple conspiracy instruction if the evidence does not warrant such an instruction. *United States v. Perry,* 550 F.2d 524, 531 (9th Cir.1977).

■ Towers bases his argument that there were multiple conspiracies on the allegation that the conspiracy ended in 1977 with the arrest of Cockman. However, an examination of the record reveals that Doyle discounted the selling price of his cocaine immediately after the arrest in an attempt to raise attorneys fees for Cockman and that McCord sold the discounted cocaine. Moreover, McCord informed the court that, on his return to the United States in 1978, Towers advised him that he continued to sell narcotics to Doyle for resale at that time. Indeed, Towers sold narcotics to McCord and McCord observed cocaine and large sums of money in Towers' home during 1978. Barron testified that he transported marijuana and cocaine from Florida to Indiana and California from 1976 through 1980 and that he overheard conversations identifying the source

of the drugs as "Everett" or "Towers." The bracelet and airplane tickets seized in Doyle's Indianapolis apartment and the record of phone calls between Doyle, Towers, and other members of the conspiracy covering the period from September, 1979 to December, 1980 demonstrated that the members of the conspiracy were in contact with one another until Barron and Doyle were arrested for narcotics transactions in Indianapolis in January of 1981. Viewing this evidence in the light most favorable to the government, we agree with the district court that the evidence established one single on-going conspiracy rather than multiple conspiracies. Thus, we hold the evidence did not warrant a multiple conspiracy instruction and the district court's rejection of Towers' proffered instruction was proper.

### D. Special Dangerous Drug Offender

At the post-trial hearing on the question of whether Towers was a Special Dangerous Drug Offender, the judge took judicial notice of the proceedings in Towers' jury trial, including the indictment, testimony and exhibits. Additionally, the judge heard testimony from Walter Quigley, an informant for the DEA; Kathy Church, Towers' common-law-wife; and Stephen Canfield, a deputy sheriff for Broward County, Florida. Quigley reiterated testimony he had given at trial concerning narcotics trafficking with Towers and McCord. Church testified that on September 2, 1981, Towers beat her with a gun in a drunken rage because the couple had separated. According to Church, Towers screamed, "I am going to kill you!", pointed the gun at her and pulled the trigger but the gun did not fire. Canfield informed the court that he had taken Church to the hospital after the beating where she was treated for a broken nose and bruises. Judge Steckler found that Towers had derived substantial income from a pattern of dealing in controlled substances. Further, he found that Towers manifested special skill, knowledge and expertise in the commission of the narcotics offenses because he was able to obtain large quantities of cocaine; he utilized shell corporations to conceal his real estate dealings and investments and to launder the proceeds of his narcotics transactions; and he manifested supervisory control over other members of the conspiracy. The judge concluded that the quantity of cocaine sold in the course of the conspiracy (at least 200 kilograms) demonstrated that Towers is a "professional" in the cocaine business and his role in the conspiracy was that of the "godfather." Finally, the court found that Towers was dangerous based upon testimony at trial that Towers had threatened to "eliminate" anyone who threatened the on-going nature of the conspiracy. The court held that, "[t]he Defendant's attempted homicide of Kathy Church, although discounted by the nature of their dispute, nevertheless shows that the Defendant had the ability and temperament to carry out his threats." The court concluded that Towers was special and dangerous pursuant to 21 U.S.C. § 849(e)(2) and 849(f) and subject to the enhanced penalties provided in 21 U.S.C. § 849.

Towers argues that the government's presentation of Church's testimony was an assertion of an independent crime. Citing *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967), Towers argues that his sentence as a Special Dangerous Drug Offender was punishment for this separate crime, which the government had established by "a mere preponderance of the evidence" in violation of his due process rights. Additionally, Towers contends that imposition of an enhanced sentence based upon the same evidence used to convict him at trial violates the Double Jeopardy Clause.

21 U.S.C. § 849(b) provides that if the district court finds that a person convicted of a felony violation of Title II and III of the Controlled Substances Act (Pub.L. 91–513, October 27, 1970, 84 Stat. 1242, 1285) was also a special dangerous drug offender, then it shall sentence him to imprisonment, "for an appropriate term not to exceed twenty-five years and not disproportionate in severity to the maximum term otherwise authorized by law for such felo-

nious violation." A drug offender is "special," if he, "committed such felonious violation as part of a pattern of dealing in controlled substances which was criminal under applicable laws of any jurisdiction, which constituted a substantial source of his income, and in which he manifested special skill or expertise." § 849(e)(2). A defendant is dangerous, "if a period of confinement longer than that provided for such felonious violation is required for the protection of the public from further criminal conduct by the defendant." § 849(f).

In a hearing to determine whether a defendant is a special dangerous drug offender, the "defendant and the United States shall be entitled to assistance of counsel, compulsory process, and cross-examination of such witnesses as appear at the hearing." § 849(b). The judge may consider evidence presented at trial and during the sentencing hearing, and information contained in the presentence report. *Id.* The determination of whether a defendant is a special dangerous drug offender is made upon a preponderance of the evidence. *Id.* The judge must make findings in the record of the information on which he relied, as well as the reasons for the sentence that he imposed. *Id.*

█ We first turn to Towers' contention that Kathy Church's testimony, offered to prove that he was "dangerous" under § 849(f), violated his due process rights. Contrary to Towers' assertion that he is being punished for a separate crime, "[t]he dangerous special offenders provisions do not make being 'dangerous' a criminal offense; rather they allow a sentencing judge to enhance the punishment for certain individuals convicted—not of being dangerous—but of the underlying felony." *United States v. Davis,* 710 F.2d 104, 107 (3d Cir.1983).[2] Moreover, *Specht* does not hold that due process requires that all findings made by the sentencing judge be based on proof beyond a reasonable doubt. *Id.* Accordingly, we have held that proving dangerousness by a preponderance of the evidence is constitutional. *United States v. Inendino,* 604 F.2d 458, 463 (7th Cir.1979); *United States v. Neary,* 552 F.2d 1184 (7th Cir.), *cert. denied,* 434 U.S. 864, 98 S.Ct. 197, 54 L.Ed.2d 139 (1977). The Supreme Court held in *Specht* that in a sentencing proceeding:

> "Due process ... requires that [the defendant] be present by counsel, have an opportunity to be heard, be confronted with witnesses against him, have the right to cross-examination, and to offer evidence of his own. And there must be findings to make meaningful any appeal that is allowed."

386 U.S. at 610, 87 S.Ct. at 1212. An examination of the post-trial hearing provided in § 849(b) reveals that § 849(b) provides all of the procedural protections delineated in *Specht*—i.e., a hearing in which the defendant is entitled to counsel, compulsory process, examination of witnesses, and presentation of evidence on his behalf; furthermore, the section requires the judge to make specific findings on the record. We hold that Towers' contention that the court's finding of dangerousness under 21 U.S.C. § 849(f) violated due process is without merit.

█ Finally, we reach Towers' contention that imposition of an enhanced sentence based upon the same evidence used to convict him at trial violated the Double Jeopardy Clause. Contrary to Towers' belief, the Special Dangerous Drug Offender statute does not create a separate criminal charge but instead provides for the enhancement of the penalty for the defend-

---

**2.** Davis was sentenced under 18 U.S.C. § 3575 as a special dangerous offender. Very few cases have interpreted 21 U.S.C. § 849, which was patterned after 18 U.S.C. § 3575. The definition of "special" in § 849 differs from the § 3575 definition only in that the underlying felony must be a violation of the Controlled Substances Act. The definition of "dangerous" is the same in both statutes. Additionally, the post-trial hearing to determine the defendant's status as a special dangerous drug offender is identical to the hearing to determine whether a defendant is a special dangerous offender. Accordingly, we hold that our cases interpreting 18 U.S.C. § 3575(b), (e)(2) and (f) are binding precedent in the interpretation of 21 U.S.C. § 849(b), (e)(2) and (f).

ant's criminal conviction. *See Inendino,* 604 F.2d at 463. A determination that the defendant is "special" under subsection (e) exposes the defendant to an increased punishment for his crime and a finding that the defendant is "dangerous" under subsection (f) determines whether and to what extent a sentence in excess of the maximum for the particular offense is appropriate. *Neary,* 552 F.2d at 1193–94. The finding that a defendant is a special dangerous drug offender simply allows the sentencing judge to impose a criminal penalty appropriate to the circumstances of the offense and to the history and character of the defendant and is similar to a recidivist statute. Recidivist statutes do not constitute a new jeopardy. *Gryger v. Burke,* 334 U.S. 728, 732, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948). We hold that the imposition of an enhanced sentence under 21 U.S.C. § 849 based upon the same evidence used to convict a defendant at trial does not violate the Double Jeopardy Clause.

The defendant's convictions and sentence are AFFIRMED.